UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DEBRA M. FRANKLIN | * | CIVIL ACTION NO. 16-16026 |
| | * | |
| VERSUS | * | SECTION: "G"(1) |
| | * | |
| NANCY A. BERRYHILL, ACTING | * | JUDGE |
| COMMISSIONER OF THE SOCIAL | * | NANNETTE JOLIVETTE BROWN |
| SECURITY ADMINISTRATION | * | |
| | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |

**************************************    *

REPORT AND RECOMMENDATION

The plaintiff, Debra M. Franklin, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. § 1381. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 10) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 12) be GRANTED.

**Procedural Background**

Ms. Franklin applied for DIB on May 7, 2014, asserting a disability onset date of January 1, 2011. R. at 151. She alleged the following illnesses, injuries, or conditions:  arthritis, legs give out, bulging disc in back, hip problems, whole body hurts every day, thyroid removed, hands and feet cramp up. R. at 60.  On June 10, 2014, her claim was denied by the state agency.

Ms. Franklin obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"), which was held on April 30, 2015. R. at 23. On July 1, 2015, the ALJ issued an adverse decision. R. at 12-19. The Appeals Council denied review on September 20, 2016. R. at 1.

1

On November 2, 2016, Ms. Franklin filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 8, 9). The parties filed cross-motions for summary judgment. (Rec. Docs. 10,12). Ms. Franklin is represented by counsel.

## Evidence in the Record

*Medical Records*

Ms. Franklin was injured in a motor vehicle accident on May 22, 2003. R. at 526. She visited the North Oaks Medical Center Emergency Services Department complaining of sacral, hip, and shoulder pain at an intensity of 6 out of 10. R. at 526.

The next medical record in the record before the ALJ is dated March 30, 2010, when she visited the LSU-HCSD Lallie Kemp Medical Center for flu, GERD (gastroesophageal reflux disease), hypothyroidism, and positive ANA.[1] R. at 482. She also complained of neck pain at intensity level 3 on a 10 point scale. R. at 482. Diagnoses were noted as hyperthyroidism, arthralgia, GERD, positive ANA, and DJD.[2] R. at 483. It appears Ms. Franklin may have been referred to a rheumatology clinic. R. at 483. On August 26, 2010, she had blood work done at the Lallie Kemp Medical Center. R. at 479. On September 3, 2010, she visited the Lallie Kemp Medical Center and complained of a slight headache. R. at 480. Diagnoses were noted as DJD, positive ANA, arthralgia, hyperthyroidism, GERD, and decreased blood pressure. R. at 418.

Ms. Franklin was injured in another motor vehicle accident on May 6, 2011. R. at 231; 512. She visited the North Oaks Medical Center Emergency Services Department that same day. R. at 512. The airbag had not deployed during the accident and extrication had not been required. R. at 512. She complained of a headache and a tight feeling in her left chest and right shoulder and right

---

[1] This abbreviation may refer to anti-nuclear antibodies.
[2] This abbreviation may refer to degenerative joint disease.

hip pain. R. at 512. She complained her pain was at level 10 on a 10 point scale. She also complained of some mild right-sided neck pain. R. at 515.  R. at 512. Cervical spine x-rays showed no acute findings and degenerative disc disease at C5-C6 with slight retrolisthesis. R. at 502. She was given Zofran and a morphine sulfate injection. R. at 513. She was discharged with pain at a level of 0/10. R. at 513. She was prescribed Robaxin, Naprosyn, and Lortab 5/500. R. at 517.

On May 12, 2011, Ms. Franklin returned to the North Oaks Medical Center Emergency Services Department complaining of dizziness and light-headedness. R. at 505. She denied weakness, paralysis, and numbness. R. at 508. Her gait was noted to be stable. R. at 508. An EKG was conducted and she was prescribed meclizine. R. at 508.

On May 17, 2011, she visited the Lallie Kemp Medical Center. R. at 477. She complained of neck pain and dizziness. R. at 477. Diagnoses included DJD, arthralgia, GERD, hyperthyroidism, positive ANA, dizziness, back-lash injury, neck/shoulder/back pain related to motor vehicle accident. R. at 478.

She visited the Healing Health Center of Hammond ("HHCH") on May 25, 2011, and reported the following symptoms following the car accident: headache, neck pain and stiffness, dizziness, nausea, confusion, fatigue, tension, irritability, mid-back pain, low-back pain, pelvic pain, constipation, chest pain and sleeping problems. R. at 231. Ms. Franklin reported cervical pain at a level of 10 on a scale of 1 to 10; right shoulder pain at a level of 10, thoracic pain at a level of 10, lumbar pain with no indication of severity, right hand tingling at a level of 8-9, and bilateral ankle pain and tingling with no severity level reported. R. at 231-32. A cervical spine examination was performed and tenderness to palpation and decreased range of motion were noted. R. at 232. A lumbar spine examination was performed with L3-L5 tenderness to palpation noted as well as bilateral muscle spasms of the rhomboid with tenderness to palpation. R. at 232.  She was positive

bilaterally on her straight leg test, positive for her cervical compression test, and negative for her cervical distraction test. R. at 288. Notes indicate that cervical, thoracic, and lumbar radiographs were taken, however copies of any associated reports are not included in the HHCH records provided. R. at 232.

Ms. Franklin returned to HHCH the next day and received bioelectrical therapy to the thoracic region. R. at 234. She returned to HHCH the following week on May 31, 2011, and reported cervical pain reduced to an intensity of 5, thoracic pain reduced to 0, and lumbar pain reduced to 4. R. at 235. Bioelectrical therapy was applied to the cervical region and a chiropractic adjustment was given to the cervical, thoracic, and lumbar spine. R. at 236. A prescription dated June 1, 2011, is included in Ms. Franklin's HHCH file showing that she was prescribed Lortab 7.5/500 mg. R. at 292.

On Ms. Franklin's June 7, 2011, follow up visit at HHCH, she reported cervical spine pain continuous but improving and at an intensity of 3; thoracic spine pain at a level of 4; and lumbar spine pain at a level of 5. R. at 237. Bioelectrical therapy was applied to the thoracic region, and she was given a chiropractic adjustment to the cervical, thoracic, and lumbar spine. R. at 238. Ms. Franklin returned the following day reporting cervical spine pain at level 7, thoracic spine pain at 6, and lumbar spine pain at 6-7. R. at 239. Bioelectrical therapy and chiropractic adjustment was again provided. R. at 240. Ms. Franklin returned again the following day reporting intermittent cervical spine pain with no intensity rating, thoracic spine pain at level 7, and lumbar spine pain at level 8. R. at 241. Bioelectrical therapy and chiropractic adjustment was provided. R. at 241.

Ms. Franklin's next visit was on June 13, 2011, when she reported moderate cervical, lumbar, and thoracic spine pain. R. a 243. Bioelectrical therapy and chiropractic adjustment was provided. R. at 243. The following day she reported no change in pain and the same therapy was

provided. R. at 245. The next day she reported worse lumbar and thoracic pain and moderate cervical spine pain. R. at 246. The same therapy was provided. R. at 246.

On June 21, 2011, Ms. Franklin reported continuous right hip pain at level 6, and at level 10 the previous night. R. at 247. She reported thoracic and lumbar spine pain at level 7. R. at 247. Cervical spine pain was not addressed in the report. R. at 247. Bioelectrical therapy and chiropractic adjustment were again provided. R. at 247. She was prescribed Lortab 7.5 for pain. R. at 299. The next day she reported right hip pain at level 7, lumbar spine pain at level 7, and cervical spine pain at level 1. R. at 249. No notes regarding thoracic spine pain were provided. R. at 249. She received bioelectrical therapy to the right hip and a chiropractic adjustment to the cervical and lumbar spine. R. at 249. The following day, Ms. Franklin reported right hip pain at level 10, lumbar spine pain at 10, and thoracic pain at level 6. R. at 250.

On June 27, 2011, she reported improving cervical spine pain at level 6, improving thoracic spine pain at level 5, and improving lumbar spine pain at level 5. R. at 251. Range of motion tests were performed and spine impairment total was 20%. R. at 310. Broken down by area, the testing concluded 8% cervical impairment, 7% thoracic impairment, and 7% lumbar impairment. R. at 310. On June 30, 2011, she reported improving cervical, thoracic, and lumbar spine pain at level 4-5. R. at 253.

On July 5, 2011, she reported worse cervical and lumbar spine pain at level 6 and improving thoracic spine pain at level 0. R. at 255. Bioelectrical and chiropractic therapy was provided. R. at 255. Dr. Greenberg called in a one-week prescription for Lortab because her usual physician, Dr. Blackman, was not in the office. R. at 318. On July 7, 2011, Ms. Franklin reported intermittent and moderate cervical, lumbar, and thoracic spine pain. R. at 256. Bioelectrical and chiropractic therapy was provided. R. at 256. On July 11, 2011, she reported improving cervical and thoracic

5

spine pain at level 5, with no report regarding lumbar spine pain. R. at 258. Bioelectrical and chiropractic therapy was provided. R. at 258. A prescription dated July 12, 2011, prescribed Lortab 7.5. R. at 321.  On July 14, 2011, Ms. Franklin reported intermittent and moderate thoracic and cervical spine pain. R. at 259. Continuous lumbar spine pain radiating in the right hip was reported with no indication of intensity. R. at 259. Bioelectrical and chiropractic therapy was provided. R. at 259. On July 18, 2011, Ms. Franklin reported cervical spine pain at level 6-7, thoracic spine pain at level 5, and lumbar spine pain at 6. R. at 260. Bioelectrical therapy was applied and she received a chiropractic adjustment. R. at 260. On July 19, 2011, Ms. Franklin again reported cervical spine pain of 6-7, thoracic pain at level 5, with lumbar spine pain reported at 5. R. at 262. A range of motion examination was performed. R. at 262. Total spine impairment was found to be 27%, with total cervical impairment at 7%, total thoracic impairment at 8%, and total lumbar impairment at 15%. R. at 332. She was negative on her straight leg test, cervical distraction test, and cervical compression test. R. at 324.

On July 25, 2011, Ms. Franklin reported her lumbar spine pain was severe and unchanged, her cervical spine pain was improving and at an intensity level of 4, and her thoracic spine pain was also improving and at an intensity level of 3. R. at 263. She was prescribed Lortab 7.5 on July 26, 2011. R. at 341.

On August 1, 2011, Ms. Franklin reported intermittent right foot pain that was at a level of 0 intensity at the time of her appointment, but had been at level 9 over the weekend. R. at 264. She reported cervical spine pain of 4-5 and lumbar spine pain of 5 that had been at level 9 over the weekend. R. at 264. She received bioelectrical therapy and a chiropractic adjustment. R. at 264. On August 8, 2011, Ms. Franklin reported thoracic and cervical spine pain at level 5. R. at 265. Bioelectrical therapy was applied as well as a chiropractic adjustment. R.at 265. She was

6

prescribed Lortab 7.5 on August 9, 2011. R. at 344. On August 15, 2011, the only spinal pain reported by Ms. Franklin was thoracic pain at level 5. R. at 266. A range of motion examination was performed. R. at 266. Total spine impairment was 16%, with cervical impairment at 7%, thoracic impairment at 6%, and lumbar impairment at 4%. R. at 354. She was negative on her straight leg test, cervical distraction test, and cervical compression test. R. at 346. On August 17, 2011, Ms. Franklin reported shoulder pain at level 6, lumbar spine pain at level 6, and cervical spine pain at level 6. R. at 267. Cervical spine decreased range of motion was noted. R. at 267. A chiropractic adjustment was provided. R. at 267. Ms. Franklin performed anterior, posterior, and lateral rocker ball exercises as well as interior and exterior band exercises and wall grabs. R. at 267. On August 18, 2011, Ms. Franklin reported cervical spine pain at level 4 and lumbar spine pain at level 5. R. at 268. The same exercises were performed and a chiropractic adjustment was provided. R. at 268. On August 22, 2011, Ms. Franklin reported thoracic and lumbar spine pain at level 7. R. at 269. Exercises were performed and a chiropractic adjustment was provided. R. at 269. On August 23, 2011, Lortab 10 was prescribed. R. at 364. On August 24, 2011, Ms. Franklin reported mild and intermittent cervical pain, improving thoracic pain at level 7, and intermittent lumbar pain at level 4. R. at 270. Exercises were performed and a chiropractic adjustment was provided. R. at 270. On August 25, 2011, cervical pain was reported as improving, intermittent pain in the right trapezius muscle at level 6 was reported, and lumbar pain was reported as unchanging. R. at 271. A range of motion examination was performed. R. at 270. Total impairment was 17%, with cervical impairment at 9%, thoracic impairment at 9%, and lumbar impairment at 0%. R. at 374. Her straight leg test was negative, her cervical distraction test was negative, and her cervical compression test was negative. R. at 366. She was negative on her straight leg test, cervical distraction test, and cervical compression test. R. at 366. On August 29, 2011, Ms. Franklin

reported cervical and thoracic spine pain at level 4 and lumbar spine pain at level 5. R. at 272. A chiropractic adjustment was given and exercises were performed. R. at 272.

On September 1, 2011, Ms. Franklin reported thoracic pain at level 4. R. at 273. No lumbar or cervical spine pain was noted. R. at 273. Exercises were performed and a chiropractic adjustment was given. R. at 273. On September 6, 2011, Ms. Franklin was prescribed Lortab 10. R. at 283.

On September 11, 2011, Ms. Franklin visited the North Oaks Medical Center Emergency Services Department complaining of swollen ankles. R. at 535. Chest x-rays were performed resulting in the following impressions: 1) slightly shallow inspiration but no visible or acute neoplastic chest disease or cardiomegaly; 2) stable mild upper thoracic levoscoliosis. R. at 542. She was diagnosed with peripheral edema, prescribed hydrochlorothiazide, and instructed to keep her feet elevated and avoid excess salt intake. R. at 544.

On September 13, 2011, Ms. Franklin returned to HHCH and reported cervical, lumbar, and thoracic pain improved and at level 3. R. at 274. Ms. Franklin performed the same exercises. R. at 275. A range of motion examination was performed. R. at 274. Total spinal impairment was 14%, with 6% cervical impairment, 9% thoracic impairment and 0% cervical impairment. R. at 393. She was negative on her straight leg test, cervical distraction test, and cervical compression test. R. at 385. A work evaluation examination was also performed and "medium" was advised. R. at 274. The work evaluation examination included 50 functional tests that were marked on a scale of 1 (able) to 3 (restricted) to 5 (unable). R. at 400. Ms. Franklin was rated at level 1 or 2 for all but five activities for which she was marked at level 3. For example, she was marked at "2" for ability to carry 20 pound groceries or lift a 50 pound crate to eye level. R. at 400. She was marked

"3" for ability to lower and lift a 100 pound crate and ability to carry a 20 pound bucket up a step ladder. R. at 400.

At Ms. Franklin's September 15, 2011, visit to HHCH, no complaints of pain were noted. R. at 275. She performed exercises. R. at 275. On September 20, 2011, she reported moderate cervical spine pain and reported that she had severe lumbar spine pain the day before but felt better when she woke up in the middle of the night. R. at 276. She performed exercises. R. at 276. She was prescribed Lortab 10. R. at 403. On September 21, 2011, she reported mild pain in her right trapezius, with no other complaints. R. at 277. She performed exercises. R. at 277. On September 22, 2017, she reported a mild pain in her tailbone and that she had experienced pain in her trapezius muscle at level 3 the day before. R. at 278.

On September 26, 2011, Ms. Franklin reported thoracic and lumbar spine pain at level 6, and cervical spine pain at level 5. R. at 279. She performed exercises and received a chiropractic adjustment. R. at 279. On September 28, 2011, Ms. Franklin complained only of mild pain in her right trapezius. R. at 281. She performed exercises. R. at 281. On September 29, 2011, she reported cervical spine pain at level 6 and thoracic spine pain at level 8. R. at 282. A range of motion examination was performed. R. at 282. Total impairment was 14%, with cervical impairment at 5%, thoracic impairment at 9% and lumbar impairment at 0%. R. at 414. She was negative on her straight leg test, cervical distraction test, and cervical compression test. R. at 407. She was prescribed Lortab 10 on October 4, 2011. R. at 422.

On November 18, 2011, she visited the LSU-HCSD Lallie Kemp Medical Center. R. at 473. She complained of pain in the back of her neck, shoulder blade, and knee. R. at 472. Diagnoses included DJD, arthralgia, GERD, hyperthyroidism, dizziness, neck/shoulder. R. at 473.

On December 16, 2011, she visited the North Oaks Medical Center Emergency Services Department. R. at 489. She complained that she slipped and fell and had pain in her left ribs, neck, and shoulder. R. at 489. Good range of motion was noted. R. at 492. An x-ray of the cervical spine was performed. R. at 492. Slight retrolisthesis of C5 and C6 was noted, as well as disc space narrowing and osteophytosis, at C5 and C6. R. at 498. An impression of degenerative disc disease act C5-C6 was noted. R. at 498. She was prescribed Robaxin, Medrol, and Lortab 5/500. R. at 493. She was also instructed to apply cool compresses to the affected areas, moist heat the following day. R. at 493. She could take Ibuprofen for pain or soreness. R. at 493.

*Ms. Franklin's Testimony*

Ms. Franklin testified on April 30, 2015, that in late 2010, she was performing janitorial work, but began having problems with her "legs . . . giving out" and her back "giving [her] more problem[s]. " R. at 27. These conditions made it difficult for her to walk, haul trash, climb the stairs, lift, bend, and pull. R. at 28.  She also testified that at that time, the medication she was taking made her feel up and down, and she could not take it at work. R. at 27. As a result of these issues, Ms. Franklin testified that she was unable to complete the hours requested and had to leave the job. R. at 28.

Since that time, Ms. Franklin testified, she works once a month organizing office paperwork. R. at 28-29. The work is less strenuous than her work as a janitor. R. at 31. Even so, Ms. Franklin said that if she is having a bad day, she does not go. R. at 28. The ALJ asked if she could perform this work on a full time basis, but Ms. Franklin said she could not do so because she has so much pain and because of the medication she is taking. R. at 32. Ms. Franklin explained that her doctors just keep increasing the dosage of her medication. R. at 46.

Before performing janitorial work, Ms. Franklin was a dietary cook at a nursing home. R. at 32. She was on her feet all day and would boxes or crates of food products like milk, juice, and produce.  R. at 32-33. At other points she also performed housekeeping once a week, worked as a cement finisher, and pressed laundry at a cleaner's. R. at 34-36.[3]

She explained that she had been experiencing pain for about 16 years, starting with pain in her feet. R. at 38. She began having back pain around 2009 or 2010. R. at 38. Ms. Franklin testified that during 2011 she could sit comfortably for about 15-20 minutes and stand for about 15 minutes. R. at 39. At that time, her ability to bend and pick things up reduced. R. at 40. Ms. Franklin testified that she went to physical therapy for about three to six months in 2011. R. at 53. She said the physical therapy helped "some." R. at 53. She said the therapy strengthened her arms and legs and it seemed like she had "more mobility." R. at 54.

The ALJ noted that Ms. Franklin brought and used a cane at the hearing. R. at 40. Ms. Franklin testified that a doctor had suggested the cane for balance after she went to the emergency room with complaints that her legs were giving out. R. at 40-41. Ms. Franklin could not recall the exact time frame but believed this occurred around 2013. R. at 42.

The ALJ asked Ms. Franklin to describe a typical day. R. at 46. She said that when she wakes, she is "dragging and drowsy." R. at 46. She said that because of the medicine, she sometimes feels sleepy and sometimes feels up and down. R. at 46. She said she lays around, that she sometimes watches TV but mostly turns it off to meditate and rest. R. at 47. She also reads sometimes and plays games or researches things on her phone. R. at 47-48. With regards to housework, Ms. Franklin testified that on a good day, she will pick up things around the house and put them away. R. at 49. She testified that she could not stand and cook beyond getting a meal

---

[3] In her disability application materials, Ms. Franklin reported that she worked as a presser from 2004-2005, a dietary cook from 2008-2009, and a janitor from 2009-2010. R. at 181.

started. R. at 49. She testified that while she washes the clothes, she cannot dry them. R. at 50. She

testified that she goes to the grocery store about once a month and that she rides in a cart at the

store. R. at 50. She testified that she goes to church some Sundays, but sometimes she misses the

service or leaves the service early because she cannot sit all the way through it. R. at 51. She

testified that she drives once or twice a week. R. at 51. Ms. Franklin stated that she used to walk

for "therapy," but that she had not been doing so for the preceding year or two. R. at 52.

*Disability Application Materials*

In the Function Report she filled out in June 2014 in connection with her disability

application, Ms. Franklin reported that she walks three times a week. R. at 191. She reported that

she needs her husband's help getting in and out of the bathtub, and that she needs his help putting

on her shoes. R. at 191. She noted that she needs to be reminded to take her medication, and also

reported that she is forgetful. R. at 190, 192. She reported that she "cannot work a full time or part

time job on a[n] every day bas[is] because of the pain and so[re]nes[s] on my body." R. at 190.

During the course of the state agency review of Ms. Franklin's application, a face to face

interview was conducted by K. Gerarve resulting in a Disability Report. Gerarve noted that Ms.

Franklin "did complain during the interview of being in a lot of pain but no difficulties moving or

with mobility [were] noticed." R. at 178. Ms. Franklin reported that she was taking the following

medications: Celebrex (anti-inflammatory), cyclobenzaprine (muscle relaxer), levothyroxine

(thyroid), RANItidine (acid reflux), tramadol (pain). R. at 182. She reported no mental conditions.

R. at 183.

The examiner found that there were no physical examinations in Ms. Franklin's file giving

functional limitations prior to December 31, 2011, the date Ms. Franklin was last insured. R. at 62.

The examiner concluded that there was insufficient evidence to find her disabled prior to that date. R. at 62.

In connection with her appeal of the state agency decision, Ms. Franklin (apparently with the assistance of her counsel) filled out another report. R. at 213. Ms. Franklin reported a change in condition starting in May 2014, and explained that her legs are getting worse, it is difficult for her to walk, and it is hard for her to stand or sit for prolonged periods of time. R. at 213. The form required that she list the medications she was taking and any side effects. R. at 216. She listed Tramadol, Levothyroxin, ranitidine, cyclobenzaprine and noted no side effects. R. at 216-17. She also listed Celebrex as a medication and noted constipation and swollen feet as side effects. R. at 218.

*Vocational Expert Testimony*

The vocational expert classified Ms. Franklin's previous work as dietary aid, a janitor, and a housekeeper at a medium exertion level. R. a 55-56. The expert classified Ms. Franklin's previous work as a hand presser and clerical worker at a light exertion level. R. at 56. The expert confirmed these assessments were consistent with the Dictionary of Occupational Titles ("DOT"). R. at 56.

The ALJ posed the following hypothetical person to the vocational expert for an opinion as to whether the hypothetical person could perform Ms. Franklin's previous work as actually or generally performed: a person of Ms. Franklin's age (46 during the relevant time period) and education level who could perform medium level work, except that she could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds, could frequently balance and occasionally stoop, kneel, crouch, and crawl. R. at 56. The vocational expert testified that this hypothetical individual could perform work as a dietary aide, clerical worker, and hand presser, however, the person could

13

not work as a janitor. R. at 56. The vocational expert further testified that this hypothetical person

could also perform the work of cleaner (medium exertion level, SVP 1), hand packager (medium

exertion level, SVP 2), and production worker (medium exertion level, SVP 2). R. at 57. The

vocational expert testified that there were 2,749 cleaner positions in Louisiana and 195,966 in the

national economy; there were 1,023 hand packager jobs in Louisiana and 165,840 in the national

economy, and 1,607 production worker jobs in Louisiana and 95,581, in the national economy. R.

at 57. The vocational expert confirmed that her testimony was consistent with the DOT. R. at 57.

The ALJ posed a second hypothetical to the vocational expert: a person identical to that in

the first hypothetical, but the person would miss two days of work per month. R. at 57. The

vocational expert testified that such a person could not perform the jobs described, and could not

perform any work in the economy. R. at 57. The expert explained that while such a person could

get a job, the person would not be able to hold a full time position. R. at 57-58.

### Decision of the Administrative Law Judge

The ALJ concluded that Ms. Franklin last met the insured status requirements of the Act

on December 31, 2011.[4] R. at 14. The ALJ found that Ms. Franklin had not engaged in substantial

gainful activity during the period from her alleged disability onset date of January 1, 2011, through

her date last insured, December 31, 2011. R. at 14. The ALJ determined that through the date last

insured, Ms. Franklin had the following severe impairments: mild degenerative disc disease of the

lumbar spine and degenerative disc disease of the cervical spine at the C5-C6 level. R. at 14. The

---

[4] There is no dispute that the ALJ correctly calculated Ms. Franklin's date last insured. There is also no dispute that Ms. Franklin must establish a period of disability while she was still insured. See 20 C.F.R. § 404.131 ("To establish a period of disability, [the claimant] must have disability insured status in the quarter in which you become disabled or in a later quarter in which you are disabled."); see also 42 U.S.C. 423(a), (c) Thus, evidence of impairment after December 31, 2011, is irrelevant. Torres v. Shalala, 48 F.3d 887, 894 (5th Cir. 1995) ("Evidence showing the degeneration of his condition after that date was not relevant to the Secretary's analysis."); Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992) ("Thus, to prove that she is entitled to disability benefits, [the claimant] must not only prove that she is disabled, but that she became disabled prior to the expiration of her insured status.").

ALJ found that Ms. Franklin's alleged hyperthyroidism and gastrointestinal reflux disorder (GERD) were not severe because during the relevant period, the medical records included "minimal evidence of functional limitations incurred from these impairments." R. at 14. The ALJ also found Ms. Franklin's alleged fibromyalgia, hip pain, and osteoarthritis to be non-medically determinable because during the relevant period, the ALJ found "no evidence of loss of gait or neurological dysfunctioning to support her allegations" R. at 15. The ALJ then considered listing 1.04 and concluded that through the date last insured, Ms. Franklin did not have an impairment or combination of impairments that met or medically equalled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 15.

The ALJ next found that through the date last insured, Ms. Franklin had the residual functional capacity to perform medium work, except that she could occasionally have climbed ramps, stairs, ladders, ropes, and scaffolds; and could have frequently balanced and occasionally stooped, kneeled, crouched and crawled.  R. at 15. In making this determination, the ALJ considered the Ms. Franklin's testimony, the medical records, and the opinion of the State Agency Reviewers. R. at 16. The ALJ determined that Ms. Franklin had no past relevant work. R. at 17. The ALJ determined that Ms. Franklin was 47 on the date last insured, which resulted in her classification as a "younger individual" age 18-49 at that time. R. at 17. The ALJ noted that Ms. Franklin has subsequently changed age category to "closely approaching advanced age." R. at 17. The ALJ found that Ms. Franklin has a limited education and is able to communicate in English. R. at 17. The ALJ determined that transferability of jobs skills was not an issue because Ms. Franklin does not have past relevant work. R. at 18. The ALJ next found that through the date last insured, considering Ms. Franklin's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could

have performed.  R. at 18. In making this finding, the ALJ relied on the testimony of the vocational

expert. R. at 18. Finally, the ALJ concluded that Ms. Franklin was not under a disability as defined

by the Act at any time from January 1, 2011, the alleged onset date, through December 31, 2011,

her date last insured. R. at 19.

## Statement of Issues on Appeal

Issue No. 1.     Did the ALJ err in failing to analyze whether claimant could maintain employment
                 eight hours a day, five days a week?

Issue No. 2.     Did the ALJ err in assessing the claimant's credibility by considering her ability to
                 perform some activities of daily living?

Issue No. 3     Did the ALJ err in failing to consider medication side effects?

## Analysis

### I.  Standard of Review.

The function of this court on judicial review is limited to determining whether there is

substantial evidence in the record to support the final decision of the Commissioner as trier of fact

and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.

Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than "a mere

scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames

v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). Alternatively, substantial evidence may be described

as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a

conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the

evidence, try the issues de novo, or substitute its judgment for the Commissioner's.  Perez, 415

F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial

evidence, regardless of whether other conclusions are also permissible.  See Arkansas v.

Oklahoma, 503 U.S. 91, 113 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.    **Entitlement to Benefits under the Act.**

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id.  An assessment of the claimant's residual functional capacity

is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

**I.    Plaintiff's Appeal**.

*Issue No. 1.    Did the ALJ err in failing to analyze whether claimant could maintain employment eight hours a day, five days a week?*

The United States Court of Appeals for the Fifth Circuit has required that in some cases, the ALJ must determine not just whether a claimant can obtain employment, but also whether the claimant can maintain employment. Watson v. Barnhart, 288 F.3d 212, 217 (5th Cir. 2002). In Frank v. Barnhart, the Fifth Circuit clarified its holding in Watson, explaining that separate consideration of whether a claimant can maintain employment is not required in every case because this analysis is typically "subsumed in the analysis of the claimant's ability to obtain employment." 326 F.3d 618, 619 (5th Cir. 2003); see Perez v. Barnhart, 415 F.3d 457, 465 (5th Cir. 2005) (repeating the holding in Frank that Watson is only implicated where "the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms.") (quoting Frank, 326 F.3d at 619); Dunbar v. Barnhart, 330 F.3d 670, 672 (5th Cir. 2003) ("We do not understand [Watson] to require an explicit finding in every case that the claimant can not only engage in substantial gainful activity but maintain that employment as well."). The ALJ must separately analyze the claimant's ability to maintain employment only if there is evidence that the claimant's condition "waxes and wanes in its manifestation of disabling symptoms." Frank, 326 F.3d at 619. "[T]he claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time." Id.  In Frank, for example, the Fifth Circuit suggested that had the claimant "alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination." Id.  In contrast, a "maintain employment"

analysis is not implicated where a claimant simply testifies, as the claimant in Perez had done, that he has good days and bad days and that his pain varies in intensity between epidural injections. 415 F.3d at 465. The Fifth Circuit noted in Perez that, "[i]t is axiomatic that the pain from any type of ailment will vary in intensity, especially the farther one gets from treatment that alleviates pain." Id.

Ms. Franklin argues that her situation implicates a requirement that the ALJ separately consider whether she was able to maintain employment. Ms. Franklin insists that the record demonstrates that her physical conditions "wax and wane." She says that during a three week period in September 2011, her complaints of pain ranged between "little to no pain" to "severe back pain." The Commissioner responds that the evidence does not demonstrate that the changes in Ms. Franklin's level of pain resulted in periods of incapacity.

Ms. Franklin has exaggerated the medical records upon which she relies. While her September 2011 records from HHCH do show a fluctuation in reported intensity of pain level, as the Fifth Circuit held in Perez, changes in pain level are not, on their own, enough to obligate the ALJ to perform a separate analysis of whether the claimant can maintain employment. Further, the functional testing performed at HHCH indicates consistent functioning in September 2011. On September 13, 2011, a date on which Ms. Franklin reported cervical, lumbar, and spine pain at level 3, the range of motion examination yielded total spine impairment of 14%. R. at 274, 393. On September 29, 2011, Ms. Franklin reported cervical spine pain at level 6 and thoracic spine pain at level 8. R. at 282. Yet the range of motion examination performed that same day still yielded a total impairment of 14%. R. at 414. Ms. Franklin was negative on her straight leg test, cervical distraction test, and cervical compression test on both dates. R. at 385, 407. Furthermore, although not referenced by the ALJ, the court notes that a "work evaluation exam" was run by

HHCH on September 13, 2011, "to evaluate the patient's possible activities of daily living limitations." An extensive checklist was attached with only a few actual restrictions, all of which related to carrying, lifting, or lowering heavy items.  Ultimately, "medium" work was advised. Significantly, this evaluation by a medical provider that was treating Ms. Franklin multiple times per week between May and September 2011 does not indicate that further limitations would be required as a result of waxing and waning symptoms.

Ms. Franklin has failed to point to any evidence suggesting that the changes in her back pain or her ability to function as a result of her back conditions would have prevented her from being able to work consistently for a significant period of time in 2011. The mere allegation of fluctuating pain is insufficient to implicate the Watson "maintain employment" analysis.  The ALJ considered the medical records and Ms. Franklin's testimony in determining her residual functional capacity, and the ALJ noted that he evaluated the intensity, persistence, and limiting effects of her symptoms. In so doing, the analysis of Ms. Franklin's ability to hold a job was subsumed in the determination of Ms. Franklin's residual functional capacity. The ALJ did not err in failing to conduct a separate analysis of Ms. Franklin's ability to maintain a job.

***Issue No. 2.    Did the ALJ err in assessing the claimant's credibility by considering her ability to perform some activities of daily living?***

Citing Dedis v. Chater, Ms. Franklin argues that "a claimant's ability to participate in limited household chores, in and of itself, does not prove he has the ability to perform substantial gainful activity." 956 F. Supp. 45, 54 (D. Mass. 1997).  In Dedis, the claimant had testified that he was unable to engage in heavy household chores or any of his former recreational activities, but the ALJ concluded that the claimant's claims of incapacity were not credible. Id.  The district court

affirmed,[5] noting that it did "not believe it appropriate to question the ALJ's findings of credibility, to which considerable deference is due." Id.  Despite the language Ms. Franklin cites, the Dedis case does not support her argument.

Importantly here, the ALJ's determination of Ms. Franklin's residual functional capacity did not rely solely on Ms. Franklin's ability to perform certain daily activities. The consideration of a claimant's ability to perform daily activities as one part of the ALJ's analysis is acceptable. See Leggett v. Chater, 67 F.3d 558, 565 n.12 (5th Cir. 1995) ("It is appropriate for the Court to consider the claimant's daily activities when deciding the claimant's disability status."). The ALJ considered the medical records and found the records indicate a successful history of treatment of her impairments during the relevant period—after only three months of treatment at HHCH, her spine disability rating decreased and her straight leg raise, cervical distraction test, and cervical compression test all proved negative.  The ALJ also noted that Ms. Franklin's emergency room records about a week after the May 2011 accident indicated a normal gait and no weakness, paralysis, or numbness. R. at 508. The ALJ noted that Ms. Franklin's emergency room records after a slip and fall in December 2011 advised the use of cool compresses and ibuprofen to deal with the pain. R. at 493. The ALJ noted that her treating provider at the time did not note functional limitations of the type she complained she was experiencing (increased pain with walking, prolonged sitting). In addition to these factors, the ALJ considered that Ms. Franklin was able to perform certain daily activities like preparing meals, performing household chores, and driving when necessary. The ALJ's consideration of Ms. Franklin's ability to perform daily activities as one of many factors in assessing her residual functional capacity is not reversible error. In light of

---

[5] The district court affirmed the ALJ's decision as to the period related to this credibility determination (though reversed the ALJ's decision as to an earlier period based on a finding that the ALJ had improperly discounted the opinion of the treating physician). 956 F. Supp. at 54.

the factors considered by the ALJ, as well as the work evaluation by HHCH which recommended medium level work, the Court finds the ALJ's determination of Ms. Franklin's residual functional capacity is supported by substantial evidence.

***Issue No. 3    Did the ALJ err in failing to consider medication side effects?***

The claimant argues that the ALJ must consider "[t]he type, dosage, effectiveness, and *side effects* of any medication the individual takes or has taken to alleviate pain or other symptoms." Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, SSR 96-7P (S.S.A. July 2, 1996) (emphasis added). She cites Loza v. Apfel, where the Fifth Circuit found the ALJ's findings of fact were not substantially supported because the ALJ failed to consider the antipsychotics, antidepressants, and other medications that claimant was taking as evidence of mental impairment and disability. 219 F.3d 378, 397 (5th Cir. 2000). The court of appeals noted that "[t]he history of [the claimant's] extensive medical treatment with antipsychotic and other mood altering medications not only indicates the presence of a disabling mental illness but also the possibility of medication side effects that could render a claimant disabled or at least contribute to a disability." Ms. Franklin also cites Crowley v. Apfel, where the Fifth Circuit held that the "Commissioner's conclusion that [the claimant] suffered from no adverse side effects due to prescribed medications was in error." 197 F.3d 194, 199 (5th Cir. 1999). The court of appeals observed that the claimant had testified that he "experienced nausea, dizziness, and sore throats," and testified that he experienced side effects such as "blurred vision, tremors, and diminished coherence" as a result of having problems maintaining his blood sugar level. Id.

Insisting that the ALJ here should have made a determination regarding the side effects from medication that she experienced in 2011, Ms. Franklin points to her hearing testimony that

her medication makes her feel "dragging and drowsy." R. at 42.[6] This testimony appears to deal with the time period of the hearing, not 2011. However, the Court notes that Ms. Franklin also testified that the medication she was taking in 2011 made her feel "up and down" and that she could not take the medication and work. R. at 27.[7]

Despite her testimony, the medical records do not support a finding that she suffered side effects, let alone side effects attributable to medications that could have limited her ability to work. Ms. Franklin and her counsel fail to point to any 2011 medical record indicating that Ms. Franklin suffered from any side effects as a result of medication she was taking at that time. Despite regular visits to HHCH where she received prescriptions for Lortab, the HHCH records do not reflect any complaints of side effects. Although Ms. Franklin noted that she had experienced dizziness following the May 6, 2011, accident during her first visit to HHCH on May 25, 2011, (and indeed, she reported dizziness at the emergency room on May 12, 2011, and in a May 17, 2011, visit to the Lallie Kemp Medical Center), there is no indication that any physician determined the dizziness was a side effect of a medication. When Ms. Franklin visited the Lallie Kemp Medical Center in November 2011 complaining of neck, shoulder, and knee pain, her diagnoses included "dizziness." Again, however, there is no medical documentation supporting the proposition that any dizziness

---

[6] During 2011, Ms. Franklin's medical records indicate that she was taking Lortab. According to her disability application materials, Ms. Franklin was taking Celebrex (anti-inflammatory), cyclobenzaprine (muscle relaxer), levothyroxine (thyroid), Ranitidine (acid reflux), tramadol (pain). R. at 182. In her application documents, Ms. Franklin reported no side effects from these listed medications, except for constipation and swollen feet as a side effect of taking Celebrex. R. at 216-18.

[7] A review of the hearing transcript reveals that no other references to side effects were made. The record similarly contains no documents that should have suggested to the ALJ that an analysis of side effects was necessary or appropriate. Indeed, although Claimant's counsel raises seven bases for review of the ALJ's unfavorable decision in his August 21, 2015 request to the Appeals Council, none relate to the ALJ's failure to consider medications or their side effects. R. at 7-8. Although this may not constitute a waiver of Claimant's right to seek review of this issue with the District Court as a matter of law, it is certainly consistent with the ALJ's failure to address it; apparently, and for good reason, side effects were not anyone's focus at the time.

was related to any medication. The voluminous, contemporaneous medical records contain no references to drowsiness, mood changes, or other side effects that would be consistent with her testimony that she felt "up and down" and could not work as a result of taking medication in 2011. There is no indication of any impact of the medications on functionality.

Even had the ALJ explicitly considered Ms. Franklin's purported allegation of medication side effects, there is no evidence to support a finding that the purported side effects caused any functional impairment. This case is not like <u>Loza</u> where there was extensive treatment involving antipsychotic and mood altering drugs and where the ALJ not only failed to consider the side effects of such drugs, but also failed to consider whether the nature and quantity of the prescribed drugs indicated a disabling mental impairment. 219 F.3rd at 396. Nor is it like <u>Crowley</u>, where the Fifth Circuit found and held that the ALJ erred in saying plaintiff "reported no adverse side effects" due to prescribed medications when actually, plaintiff testified that he experienced nausea, dizziness, shaking, tremors, drowsiness and sore throats related to the medications he was taking. 197 F.3d at 196.

The only evidence of any side effects experienced by Ms. Franklin in 2011 appears to be her 2015 testimony at the hearing before the ALJ. Ms. Franklin fails to show what additional evidence might have materialized if the ALJ had further inquired into her allegation that medication made her feel "up and down" in 2011. To the extent the ALJ erred by failing to explicitly analyze Ms. Franklin's side effects, this error was harmless because there is no evidence to support a finding that any side effects suffered by Ms. Franklin in 2011 limited her ability to function. Even had the ALJ explicitly considered whether Ms. Franklin suffered any side effects, there would not have been a different result.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 10) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 12) be GRANTED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 25th day of August, 2017.

Janis van Meerveld
United States Magistrate Judge